Preiss v. Wine and Design Franchise, 2018 NCBC 98.

STATE OF NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 11895

EMILY PREISS and WINE AND
DESIGN, LLC,

                Plaintiffs,

        v.

WINE AND DESIGN FRANCHISE,
LLC; HARRIET E. MILLS;
PATRICK MILLS; and CAPITAL
SIGN SOLUTIONS, LLC,

                Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO DISMISS**

THIS MATTER comes before the Court on Harriet E. Mills ("Harriet"), Patrick Mills ("Patrick") and Capital Sign Solutions, LLC's ("CSS") (collectively the "Mills Defendants") Motion to Dismiss All Claims Against Them With Prejudice N.C. R. Civ. P. 12(b)(1) and 12(b)(6) ("Mills Motion to Dismiss", ECF No. 12), and on Wine and Design Franchise, LLC's Motion to Dismiss, ("Franchise Company Motion to Dismiss", ECF No. 14; collectively, the Mills Motion to Dismiss and the Franchise Company Motion are the "Motions to Dismiss").

THE COURT, after considering the Motions to Dismiss, the briefs filed in support of and in opposition to the Motions, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that the Mills Motion should be GRANTED, in part, and DENIED, in part, and the Franchise Company Motion should be GRANTED, in part, and DENIED, in part.

*Zaytoun Law Firm, PLLC, by Robert E. Zaytoun, John R. Taylor, and Matthew T. Ballew for Plaintiffs Emily Preiss and Wine and Design, LLC.*

*Batten Lee, PLLC, by Gloria T. Becker, Matthew Mariani, and Kari Johnson, for Defendants Harriet E. Mills, Patrick Mills, and Capital Sign Solutions, LLC.*

*Ward and Smith, by A. Charles Ellis, Marla S. Bowman, and Joseph A. Schouten, for Defendant Wine and Design Franchise, LLC.*

McGuire, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

1. The Court does not make findings of fact on motions to dismiss under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) (hereinafter, the North Carolina General Statutes will be referred to as "G.S." and the Rules of Civil Procedure will be referred to as "Rule(s)"), but only recites those facts included in the complaint that are relevant to the Court's determination of the Motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The facts in this case are drawn from the First Amended Complaint. ("FAC", ECF No. 3.)

2. In this Order the Court discusses only the facts relevant to the Court's consideration of and conclusions regarding the pending Motions to Dismiss. Other aspects of the procedural and factual history in this case are fully described in the Court's previous Orders. (Order on Defs.' Mot. to Strike CMR, ECF No. 45; Order on Pls.' Mot. to Consolidate, ECF No. 54; Order on Pls.' Mot. to Appoint Guardian ad Litem, ECF No. 72; Order on Pls.' Mot. for Protective Order, ECF No. 74.)

3. This matter arises out of a broken business relationship between friends. On June 1, 2010, Emily Preiss ("Emily") and Harriet "co-founded Wine and Design, LLC, a unique paint party business in which customers were invited to engage in painting and design activities in a relaxed social atmosphere." (ECF No.

3, at ¶ 10 (internal quotation marks omitted).) (Hereinafter, Wine and Design, LLC will be referred to as the "Raleigh Studio.") Initially, the business expenses, net earnings, and management decisions were split on a "50-50 basis" between Emily and Harriet. (*Id.* at ¶ 11.)

4. The Raleigh Studio was a success, and in June 2011, Emily and Harriet organized Wine and Design Franchise, LLC (the "Franchise Company") to franchise the concept to other locations. Between 2011 and 2014, the Franchise Company acquired over 40 franchised locations along the East Coast. The Franchise Company paid monthly distributions to both Harriet and Emily in an average of $2,186 through the last half of 2011; $4,676.33 in 2012; and $7,512 in 2013.

5. In the summer of 2013, personal conflicts between Emily and Harriet festered and began to impact their business relationship. Emily assumed control over both the Raleigh Studio and the Franchise Company for "most of the summer of 2013." (*Id.* at ¶ 18.) During this time, Harriet criticized Emily's disorganization, lack of structure, her choice of a business manager, and her "failure to hire other personnel." (*Id.* at ¶ 19.)

6. Emily was under "extreme stress" as the result of "running both businesses by herself and being harshly criticized by her close friend," and this stress was compounded by Harriet and Patrick telling employees, Emily's estranged husband John, and others that Emily was struggling with drug addiction and meeting with drug dealers at work. (*Id.* at ¶¶ 20–22.) Emily alleges that this was false, and that she "was not a drug addict, [but instead] she had long suffered from Adult

Attention Deficit Hyperactivity Disorder for which she had been treated with Adderall by mental health providers since the late 1990s." (*Id*. at ¶ 22.)

7.      "Under pressure from Harriet, Patrick, and John, [Emily] enrolled at a center known as 'Behavioral Health of the Palm Beaches' in Lake Worth, Florida" in March of 2014. (*Id*. at ¶ 24.)  The center was a treatment facility for drug addicts, with a minimum stay of thirty days, and "required her to quit taking Adderall, anxiety medication, and to daily attend group sessions." (*Id*.)  After only four days, Emily asked to withdraw from the program.

8.      Upon her return to Raleigh, Emily discovered that Harriet and Patrick had locked her out of the premises of the Franchise Company and the Raleigh Studio, and removed Emily from the companies' bank accounts.

9.      Emily and Harriet then spent several months during 2014 negotiating potential changes to their business relationship and to the structure of the Franchise Company.  Emily and Harriet were represented by attorneys during the negotiations. (*Id*. at ¶¶ 27–28.)  Emily alleges that during the negotiations, Harriet "terminated payments of distributions, dividends, salary, or any other form of compensation to [Emily]." (*Id*. at ¶ 29.)  The extended period of negotiations left Emily feeling "extremely anxious, depressed, and confused.  She was experiencing panic attacks . . . despite therapy" and prescribed medications. (*Id*.)

10.      In October 2014 Emily signed a document entitled "Restructure Agreement." (*Id*. at ¶¶ 30, 40; ECF No. 3, Ex. A.)  The Restructure Agreement had an effective date of September 1, 2014. Emily contemporaneously signed six

additional documents intended to restructure Emily's relationship with Harriet and with the Franchise Company in the following ways:

1. Harriet's 50% interest in the Raleigh Studio was transferred entirely to Emily such that Emily would hold 100% of the membership interest in the Raleigh Studio;

2. 22% of Emily's initial 50% membership interest in the Franchise Company was transferred to Harriet such that Harriet would hold 72% of the membership interest in the Franchise Company and Emily would hold 28%;

3. The Franchise Company would execute Operating Agreements that would expressly provide that Harriet would be the manager of all day-to-day operations of the Franchise Company, but that certain actions would require consent of a supermajority (in excess of Harriet's 72% membership interest);

4. Emily would have no obligation to guarantee the debts of the Franchise Company, and would not be a franchisee; and

5. The Raleigh Studio would be given the "royalty free right to use the name 'Wine and Design' and associated trademarks within a 10 mile protected territory of the Raleigh Studio" including "access and utilization of the website registration system of" the Franchise Company, outlined by a separate license agreement that would

"include the terms customary in such agreements to protect the goodwill of the 'Wine and Design' intellectual property."

(ECF No. 3, Ex. A at pp. 1–2; collectively, the Restructure Agreement and the six additional documents are the "Restructure Agreement Documents").

11. The Restructure Agreement contains a Mutual Agreement provision that states

> Harriet and [Emily] acknowledge that they, with their advisors, negotiated the restructure and terms herein and acknowledge their respective satisfaction of the division and exchange of assets as contemplated herein and other obligations as set forth.

(*Id.* at p. 4.) The Restructure Agreement also contains a broad mutual release of claims. (*Id.*)

12. The Restructure Agreement Documents include a Franchise Company Operating Agreement ("Operating Agreement"), a Trademark Licensing Agreement ("TLA"), and a Manager Contract regarding Harriet's management of the Franchise Company ("Manager Contract"). Emily alleges that the Operating Agreement provides Harriet, as Manager, the discretion to make monthly distributions of $10,000 "taking into consideration the necessary working capital reserves of the [Franchise] Company." (ECF No. 3, at ¶ 35.) Despite having adequate capital reserves, Harriet did not make the monthly distributions to Emily. Emily also alleges that Harriet engaged in self-dealing, including making improper payments from the Franchise Company to Patrick and CSS. (*Id.* at ¶¶ 33–34.) Finally, Harriet paid herself salaries that exceeded the limits provided in the Manager Contract. (*Id.* at ¶¶ 38–39.)

13. The TLA establishes the Franchise Company's exclusive ownership of the Wine and Design brand name, but gives Emily a license for the royalty-free use of the name. The Franchise Company retained the right to discontinue the license if "Harriet[ ] decided that [Emily] had not complied with any of the [TLA]'s numerous restrictions, quality assurance, [or] advertising requirements." (*Id.* at ¶ 41.) The TLA also provided that the Raleigh Studio would be listed on the Franchise Company's website. Despite this, "[f]rom time to time," Harriet removed the Raleigh Studio from the website. (*Id.* at ¶ 44.) Finally, Harriet had the option to terminate the TLA "at any time upon [her] reasonable opinion that the Raleigh Studio had failed to conform with the standards of quality in client care, use, advertising, and promotion required by [the] Agreement." (*Id.* at ¶ 45 (internal quotation marks omitted).) Harriet allegedly made frequent claims that Emily was not in compliance with the Restructure Agreement Documents. (*Id.* at ¶ 48.)

14. On September 28, 2017 Plaintiffs filed the complaint in this action. (Br. Supp. Mills Mot. Dismiss, ECF No. 13, at p. 2.) On October 18, 2017 Plaintiffs filed the FAC. The FAC contains a highly confusing set of ostensible "causes of action." The causes of action are titled as follows: "Breach of Fiduciary Duty; Coercion, Duress, and Undue Influence" (ECF No. 3, at ¶¶ 54–64); "Conversion, Misappropriation, Waste of Corporate Assets" (*Id.* at ¶¶ 65–68); "Conspiracy in Restraint of Trade or Commerce; Unfair or Deceptive Trade Practices" (*Id.* at ¶¶ 69–71); "Constructive Trust and Accounting" (*Id.* at ¶¶ 72–76); "Civil Conspiracy" (*Id.* at ¶¶ 77–81); and "Derivative Claims." (*Id.* at ¶¶ 82–85.) Plaintiffs' prayer for relief

seeks (1) a declaration that the Restructure Agreement Documents are void and for the Court to set them aside "restoring [Emily] to her 50% interest in the Franchise Company;" (2) an award of compensatory damages, punitive damages, interests, costs, and attorneys' fees, and for damages found to result from a violation of G.S. § 75 to be trebled; (3) to "[h]old any assets, income streams, distributions or other forms of remuneration due plaintiffs but received by individual defendants in constructive trust for the benefit of plaintiffs;" and (4) an order for an accounting. (*Id.* at pp. 19–20.)

15. On December 14, 2017, the Mills Defendants filed the Mills Motion to Dismiss and accompanying brief in support. (ECF No. 12; ECF No. 13.) The Mills Motion to Dismiss is made pursuant to Rule 12(b)(1) and Rule 12(b)(6) and seeks dismissal of the entire FAC as against Harriet, Patrick, and CSS.

16. On December 20, 2017, the Franchise Company filed the Franchise Company Motion and accompanying Brief in Support. (ECF No. 14; Br. Supp. Franchise Co. Mot. Dismiss, ECF No. 15.) The Franchise Company Motion seeks to dismiss Plaintiffs' derivative claims for breach of fiduciary duty, coercion, duress, and undue influence; conspiracy in restraint of trade and unfair and deceptive trade practices; and civil conspiracy.

17. Plaintiffs filed a single brief in response to both Motions to Dismiss. (Pls.' Br. Resp. Mots. Dismiss, ECF No. 41.) The Mills Defendants filed a reply on February 9, 2018. (Mills Defs.' Reply Supp. Mot. Dismiss, ECF No. 48.) The Franchise Company filed a reply on February 12, 2018. (Franchise Co. Reply Supp.

Mot. Dismiss, ECF No. 50.) The Court held a noticed hearing on the Motions to Dismiss, and the Motions are now ripe for determination.

18. On March 29, 2018, while the Motions to Dismiss were pending, Plaintiffs' Counsel moved pursuant to Rule 17(b) for appointment of a guardian ad litem ("GAL") for Emily over Emily's objection. ("Motion for GAL", ECF No. 57.) In response to the Motion for GAL, the Court held a hearing during which it conducted an extensive *voir dire* examination of Emily and considered other evidence presented by Plaintiffs' counsel. The Court determined that there was not sufficient evidence before it to proceed to a hearing on appointment of a GAL. On April 12, 2018, the Court issued an order denying the Motion for GAL without prejudice. (Order on Mot. for GAL, ECF No. 72.) On May 14, 2018 Plaintiffs' Counsel filed a Renewed Motion for Appointment of a GAL. ("Renewed Motion for GAL", ECF No. 79.) The Court summarily denied the Renewed Motion for GAL on the grounds that it was not supported by any new evidence regarding Emily's competency. (Order on Renewed Motion for GAL, ECF No. 91.)

II.     ANALYSIS

A.     **Standard of Review**

19. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Our appellate courts frequently reaffirm that

North Carolina is a notice pleading state. *See e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the res judicata, and to show the type of case brought." *Id.*

20. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face that absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted). The Court construes the complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

21. The Court may consider documents which are the subject of plaintiff's complaint and to which the complaint specifically refers, including the contract that

forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

**B.      The Issue of Emily's Mental Incompetence or Disability**

22.      Underlying many of Plaintiffs' claims in this lawsuit is the contention that Emily is, and was at the time she executed the Restructure Agreement Documents, mentally incompetent or under a disability. Plaintiffs allege that Emily was not competent to enter into the Restructure Agreement Documents, rendering those agreements void or voidable. (ECF No. 3, at ¶ 58.) In response to the Motions to Dismiss, Plaintiffs also argue that the statutes of limitations applicable to Emily's claims should be tolled because "[Emily] was under a continuing disability from the time she was first ousted from the [Franchise Company][ ] from which she has not emerged." (ECF No. 41, at pp. 9–11.) Accordingly, for purposes of deciding the Motions to Dismiss, the Court will first determine whether Plaintiffs sufficiently allege that Emily was mentally incompetent at the time she entered into the Restructure Agreement Documents or at the time her claims accrued.

23.      "A person entitled to commence an action who is under a disability at the time the cause of action accrued may bring his or her action within the [applicable statute of limitations], after the disability is removed." G.S. § 1-17(a). For purposes of G.S. § 1-17(a), "a person is under a disability if the person . . . is incompetent as defined in G.S. § 35A-1101(7) or (8)." G.S. § 1-17(a)(3). G.S. § 35A-1101(7) provides that

> [An] [i]ncompetent adult [is] an adult . . . who lacks
> sufficient capacity to manage the adult's own affairs or to

make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, mental retardation, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition.

24. Plaintiffs' allegations in the FAC do not include the words "incompetent," "disabled," or "mentally ill." Plaintiffs, however, contend that the following allegations support the claim that Emily was incompetent at the time her claims accrued:

1. At the end of 2013 Emily was "extreme[ly] stressed" from running the Franchise Company and the Raleigh Studio. (ECF No. 3, at ¶ 20);

2. Emily "had long suffered from Adult Attention Deficit Hyperactivity Disorder for which she had been treated with Adderall by mental health providers since the late 1990s when she was in college." (*Id.* at ¶ 22);

3. During the negotiations for the Restructure Agreement Documents Emily was "extremely anxious, depressed, and confused . . . [and] experiencing panic attacks" and was in therapy and taking "different medications she was prescribed by her psychiatrist." (*Id.* at ¶ 29); and

4. Emily "was deprived of the free will and deliberate judgment necessary to freely and voluntarily enter into the Restructure

Agreement Documents, such that the Restructure Agreement Documents are void and should be set aside by this Court." (*Id.* at ¶ 58.)

25. In support of their position, Plaintiffs rely on the holding in *Fox v. Sara Lee Corp.*, 210 N.C. App. 706, 709 S.E.2d 496 (2011). In *Sara Lee Corp.*, the plaintiff filed a complaint against her former employer and co-worker alleging negligent and intentional infliction of emotional distress caused by the co-worker's sexual assault of the plaintiff. The plaintiff alleged that the sexual assault caused her to suffer "severe emotional distress." *Id.* at 708, 709 S.E.2d at 498. The trial court dismissed her claims based on application of the statutes of limitations, and the plaintiff appealed. *Id.*

26. On appeal, the plaintiff contended that the trial court erred in dismissing her claims because the allegations in her complaint sufficiently alleged that she was incompetent when her claims accrued and she was entitled to tolling of the limitations periods. *Id.* The plaintiff alleged "[f]rom September, 2005 until February 2007, . . . [p]laintiff's poor mental health, . . . [prevented] [p]laintiff from working, managing her own affairs, coping with daily life, or going about by herself. During much of this time . . . [p]laintiff was obliged to live with her parents because she could not manage by herself." *Id.* at 713, 709 S.E.2d at 501. The plaintiff further alleged "that she was under psychiatric care, could not leave her house by herself, and was unable to mentally function." *Id.* Based on these allegations, and applying the standard set forth in G.S. § 1101(7), the Court of Appeals held that plaintiff

sufficiently pleaded that she was mentally incompetent, and reversed the trial court. *Id.* at 715, 709 S.E.2d at 502.

27. The holding in *Sara Lee Corp.* is inapplicable to this case, and highlights the deficiencies in Plaintiffs' allegations. Here, unlike in *Sara Lee Corp.*, Plaintiffs have not pleaded that Emily's various mental conditions or her mental state rendered her "incompetent" or prevented her from "working, managing her own affairs, coping with daily life, or going about by herself." *Id.* at 713, 709 S.E.2d at 501. Further, although Plaintiffs allege that Emily was under psychiatric care, Plaintiffs do not allege that she was suffering to the degree recognized by the North Carolina Court of Appeals in *Sara Lee Corp.*, where the plaintiff "could not leave her house by herself, and was unable to mentally function" at any time relevant to the claims in this lawsuit. *Id.* (quotation marks omitted).

28. "The appropriate test for establishing an adult incompetent is one of mental competence to *manage one's own affairs*. The term 'affairs' encompasses more than just one transaction or one piece of property to which he may have a unique attachment." *Soderlund v. Kuch*, 143 N.C. App. 361, 373, 546 S.E.2d 632, 640 (2001) (citations and quotation marks omitted) (emphasis in original). In *Soderlund*, the plaintiff alleged that "his mental condition caused him to be incapable of understanding his legal rights, making or communicating important decisions about those rights or bringing a lawsuit." *Id.* at 373, 546 S.E.2d at 640 (quotation marks omitted). The plaintiff's evidence established that "[he] suffered from extreme feelings of shame and confusion," "abus[ed] alcohol," [was] "unable to form healthy

relationships with others or lead a normal life[,] . . . had several mental breakdowns," and "contemplated suicide." *Id.* at 368, 546 S.E.2d at 637. The Court concluded that, despite this strong evidence, the "plaintiff was not incompetent as per [G.S.] § 35A-1101(7), and plaintiff's mental condition did not warrant tolling the [ ] statute of limitations[,]" because the record evidence also showed he managed his own affairs, held jobs, and managed his own day-to-day life. *Id.* at 373, 546 S.E.2d at 640.

29. The allegations in this case state only that Emily was diagnosed with Adult Attention Deficit Hyperactivity Disorder, and at various times experienced stress, anxiety, depression, confusion, and panic attacks. Plaintiffs do not allege that any of these conditions, separately or together, made Emily unable to manage her own affairs or tend to her daily life. To the contrary, Plaintiffs allege that throughout all of the stressful events underlying Emily's claims she has continued to operate the Raleigh Studio.

30. The allegations are not sufficient to support the assertion that Emily was mentally incompetent at the time she entered into the Restructure Agreement Documents or at any other time relevant to the claims in this lawsuit. The allegations do not support a claim that the Restructure Agreement Documents are void or voidable, nor the argument that the statutes of limitations on any of Plaintiffs' claims should be tolled.

31. Therefore, to the extent Plaintiffs seek an order declaring the Restructure Agreement Documents are void or voidable, as alleged in paragraph 58

of the FAC, the Motions to Dismiss should be GRANTED, and the claim and allegations DISMISSED.

32.     The Court now turns to a determination of Emily's individual causes of action.

**C.     Breach of Fiduciary Duty; Coercion, Duress, and Undue Influence**

33.     Plaintiffs First Cause of Action is labeled "Breach of Fiduciary Duty; Coercion, Duress, and Undue Influence." This attempt to assert four separately recognized legal theories under one cause of action is needlessly confusing and violates Rule 10(b), which states "[e]ach claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth." Rule 10(b); *Musten v. Musten*, 36 N.C. App. 618, 619, 244 S.E.2d 699, 700–01 (1978) ("Rule 10(b) of the Rules of Civil Procedure requires that claims founded upon separate transactions be stated in separate counts.").

34.     In the first cause of action, Plaintiffs allege that Harriet's breaches of her fiduciary duties coerced and unduly influenced Emily into signing the Restructure Agreement Documents "such that the Restructure Agreement Documents are void." (ECF No. 3, at ¶¶ 55–58.) Plaintiffs also allege that Harriet breached fiduciary duties owed to Emily after the execution of the Restructure Agreement Documents, apparently as the majority interest holder in the Franchise Company. (*Id.* at ¶¶ 59–64.) However, Plaintiffs do not expressly allege that conduct occurring after the execution of the Restructure Agreement Documents unduly influenced or coerced Emily, nor what legal effect any alleged coercion had on Emily's

legal rights after the Parties entered into the Restructure Agreement Documents. Since Plaintiffs allege that Emily was coerced and unduly influenced by conduct that allegedly constituted breaches of Harriet's fiduciary duties, the Court concludes that Plaintiffs have not stated a separate claim for coercion, duress, or undue influence, and analyzes the first cause of action solely as a claim for breach of fiduciary duty.

35. In order to establish a claim for breach of fiduciary duty, a plaintiff must show that (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff. *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). A fiduciary relationship may arise when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence[.]" *Dalton v. Camp*, 353 N.C. 647, 651–52, 548 S.E.2d 704, 707 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (internal quotations omitted). Such a relationship "extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed in one side, and resulting domination and influence on the other." *Id.* at 652, 548 S.E.2d at 707–08. However, "[o]nly when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman v. South River Elec. Membership Corp.*, 794 S.E.2d 346, 352, 2016 N.C. App. LEXIS 1234, at *11 (2016) (quoting *S.N.R.*

*Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

36.     The Mills Defendants argue that Harriet did not owe Emily a fiduciary duty prior to the execution of the Restructure Agreement Documents because Harriet and Emily were equal owners and had equal membership interests in the Franchise Company.

37.     "Under the LLC Act, members of an LLC are like shareholders in a corporation in that members do not owe fiduciary duties to each other or the LLC, except a controlling member owes fiduciary duties to minority members." *Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *23 (N.C. Super. Ct. Jan. 27, 2017); *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10 (N.C. Super. Ct. Aug. 7, 2017) (citing *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016); *Zagaroli v. Neill*, 2016 NCBC LEXIS 106, at *18 (N.C. Super. Ct. Dec. 29, 2016).

38.     Defendants are correct that Harriet owed no fiduciary duty to Emily while they remained equal co-owners of the Franchise Company.  Plaintiffs have not pleaded facts that would support an allegation that Harriet owed Emily a fiduciary duty on any other basis prior to execution of the Restructure Agreement Documents. To the contrary, in their brief Plaintiffs state that "[Emily] and Harriet were 50/50 member owners of [the Franchise Company] and the Raleigh Studio, and successfully co-managed them through the middle of March 2014." (ECF No. 41, at pp. 2–3.)  Once the dispute arose between Emily and Harriet, they engaged in adversarial

negotiations of the Restructure Agreement Documents with the assistance of counsel on both sides. Plaintiff does not allege that Emily placed any special confidence in Harriet during the period of negotiations. Their relationship during the negotiations was adversarial, and they were represented by attorneys. There could not have been a fiduciary relationship between Emily and Harriet during this period. *Cf. Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 583–84, 581 S.E.2d 68, 72–73 (2003) (finding that the fiduciary duty trustee owed to beneficiaries ended when during negotiation of a settlement agreement, "both parties were represented by counsel" and "were negotiating for the termination of legal rights"); *Lancaster v. Lancaster*, 138 N.C. App. 459, 463, 530 S.E.2d 82, 85 (2000) ("[W]hile a husband and wife generally share a confidential relationship . . . [i]t is well established that when one party to a marriage hires an attorney to begin divorce proceedings, the confidential relationship is usually over."); *Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986) (holding that husband's fiduciary duty to wife ended when the parties separated and became adversaries negotiating over the terms of their separation).

39. Therefore, the Mills Motion to Dismiss the first cause of action to the extent the claim is based on acts occurring prior to the execution of the Restructure Agreement Documents should be GRANTED.

40. Additionally, because all allegations relating to coercion, duress, or undue influence are inextricably tied to the allegations of breaches of fiduciary duties occurring prior to the execution of the Restructure Agreement Documents, to the

extent Plaintiffs purport to state causes of action for coercion, duress, and undue influence, those causes of action are DISMISSED.

41. The Mills Defendants also argue that Plaintiffs' claim for breach of fiduciary duty for Harriet's alleged breaches that took place prior to September 28, 2014 are barred by the three-year statute of limitations in G.S. § 1-52(1). (ECF No. 13, at pp. 6–7.)

42. "Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the three-year statute of limitations applicable to contract actions contained in N.C. Gen. Stat. § 1-52(1) (2003)." *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335 (2005). The Court already concluded that the allegations do not support a claim that Emily was under a disability that would toll the statute of limitations. Accordingly, the Mills Motion to Dismiss the first cause of action to the extent it is based on alleged breaches of fiduciary duties that took place prior to September 28, 2014 should be GRANTED.

43. After the Restructure Agreement Documents were signed, and Harriet became the majority owner and member in the Franchise Company, the analysis changes. As a majority owner of the Franchise Company, Harriet owed a fiduciary duty to minority member Emily. *Strategic Mgmt. Decisions*, 2017 NCBC LEXIS 69, at *10. Plaintiffs allege Harriet breached her fiduciary duty as majority member through a number of improper and unfair acts including, *inter alia*, manipulating the standards for making distributions to lower or eliminate Emily's share of distributions, diverting Franchise Company funds to Patrick and CSS, and

interfering with and terminating Emily's rights to use the Wine and Design trademark and website. (ECF No. 3, at ¶ 59.) The Court concludes that the allegations are sufficient at this stage to support a breach of fiduciary duty claim against Harriet for acts that occurred after the execution of the Restructure Agreement Documents.

44. The Mills Motion to Dismiss the first cause of action to the extent the claim is based on acts occurring after the execution of the Restructure Agreement Documents should be DENIED.

45. Plaintiffs allege that Harriet breached her fiduciary duties "in collusion with [Patrick] and [CSS]." (ECF No. 3, at ¶ 59.) However, Plaintiffs do not allege facts that would support an allegation that Patrick or CSS owed Emily a fiduciary duty. Accordingly, to the extent Plaintiffs attempt to bring the first cause of action against Patrick and CSS, the Mills Motion to Dismiss Plaintiffs' first cause of action against Patrick and CSS should be GRANTED.

**D. Conversion, Misappropriation, and Waste of Corporate Assets**

46. Plaintiffs' second cause of action is titled "Conversion, Misappropriation, and Waste of Corporate Assets." (ECF No. 3, at ¶¶ 65–68.) In support of this claim, Plaintiffs allege that Harriet "converted and misappropriated Franchise Company funds to the benefit of herself and" Patrick. (*Id.* at ¶ 66.)

47. Preliminarily, even under a generous reading of the FAC, there are no allegations specifically against Patrick or CSS that would support claims for conversion, misappropriation, or waste of corporate assets against them.

Accordingly, the Mills Motion to Dismiss Plaintiffs' second cause of action as stated against Patrick and CSS should be GRANTED.

### a. Conversion and Misappropriation of Corporate Funds

48.     "Conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (quoting *Spinks v. Taylor*, 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981)).   To state a claim for misappropriation of corporate funds, a plaintiff must allege that the defendant "(1) misappropriated funds, i.e. used funds for a purpose that does not benefit the corporation; (2) converted the funds for a use not beneficial to the corporation; and (3) converted the funds without authority." *Outen v. Mical*, 118 N.C. App. 263, 268, 454 S.E.2d 883, 886 (1995).

49.     Plaintiffs' claims for conversion and misappropriation of corporate funds against Harriet are based on the same conduct as the breach of fiduciary duty claim against Harriet for diverting corporate funds to herself and Patrick, (ECF No. 3, at ¶ 59(C)), and Plaintiffs would seem to be adequately protected by the surviving breach of fiduciary duty claim against Harriet.   Clearly, Plaintiffs would not be entitled to recover twice for the same misconduct.   Nevertheless, the Court concludes that Plaintiffs have adequately pleaded claims for conversion and misappropriation of corporate funds to survive dismissal at this stage of the case.   The Mills Motion to

Dismiss Plaintiffs' second cause of action for conversion and misappropriation of corporate funds should be DENIED.

### b. *Waste of Corporate Assets*

50. Although some jurisdictions recognize a claim for waste of corporate assets, *see, e.g., White v. Panic*, 783 A.2d 543, 554 (Del. Oct. 3, 2001), "'North Carolina does not recognize corporate waste as an independent cause of action,' because such a claim is subsumed within a breach of fiduciary duty claim." *Gao v. Sinova Specialties, Inc.*, 2016 NCBC LEXIS 104, at *22–23 (N.C. Super. Ct. Dec. 21, 2016) (quoting *Soft Line, S.p.A. v. Italian Homes, LLC*, 2015 NCBC LEXIS 6, at *15–16 (N.C. Super. Ct. Jan. 16, 2015). *See also, e.g., Green v. Condra*, 2009 NCBC LEXIS 20, at *29 (N.C. Super. Ct. Aug. 14, 2009); *McKee v. James*, 2013 NCBC LEXIS 33, at *41 (N.C. Super. Ct. July 24, 2013).

51. Accordingly, to the extent the second cause of action attempts to state a claim for waste of corporate assets separate from the claim for breach of fiduciary duty, the Motions to Dismiss should be GRANTED.

### E. Conspiracy in Restraint of Trade & Unfair and Deceptive Trade Practices

52. Plaintiffs label their third cause of action "Conspiracy in Restraint of Trade of Commerce; Unfair or Deceptive Trade Practices." (ECF No. 3, at 69–71.). Plaintiffs allege that "Defendants' actions . . . amount to a conspiracy in restraint of trade under [G.S.] § 75-1 [ ] and unfair or deceptive trade practices under [G.S.] § 75-1.1" (hereinafter, the North Carolina Unfair or Deceptive Trade Practices Act will be referred to as "UDTPA").

*a. Conspiracy in Restraint of Trade*

53.     A conspiracy in restraint of trade is an agreement between multiple market participants intending to illegally hinder trade or commerce.  G.S. § 75-1. "There has been little litigation as to the various kinds of contracts that may constitute illegal restraints of trade under G.S. [§] 75-1," but North Carolina courts generally interpret G.S. § 75-1 by looking to the "body of law applying to the Sherman Act."  *E.g.*, *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973) (conducting a thorough review and analysis of English and American common law on this topic).

> [O]nly combinations or agreements which operate to the prejudice of the public by unduly or unreasonably restricting competition or restraining trade are illegal.
>                              . . .
> The combination is not objectionable if the restraint is such only as to afford fair protection to the parties thereto and not broad enough to interfere with the interest of the public.

*Id.* at 656, 194 S.E.2d at 530–31.  "Section 75-1 requires a plaintiff to allege (1) the existence of an agreement in the form of a contract, combination, or conspiracy that (2) imposes an unreasonable restraint on trade."  *Sykes v. Health Network Sols., Inc.*, 2017 NCBC LEXIS 73, at *58 (N.C. Super. Ct. Aug. 18, 2017) (citation and quotations omitted).  To establish a claim under G.S. § 75-1, "public damage must be alleged and proven."  *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1048 (E.D.N.C. 1979).

54.     The FAC does not allege facts that would support an allegation that Defendants have acted in violation of G.S. § 75-1.  There is no allegation that multiple

market participants entered into a contract or other agreement that operated to the damage of, or would have any adverse effect on, the public. The Mills Motion to Dismiss Plaintiffs' claim under G.S. § 75-1 for conspiracy in restraint of trade should be GRANTED.

### b. UDTPA

55. "To establish a prima facie case of unfair and deceptive trade practices [in violation of G.S. § 75-1.1], a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004).

56. In enacting the UDTPA "our General Assembly sought to prohibit unfair or deceptive conduct in interactions between different market participants. The General Assembly did not intend for the Act to regulate purely internal business operations." *White v. Thompson*, 364 N.C. 47, 47–48, 691 S.E.2d 676, 676 (2010) (holding that conduct between partners in a business, even when the conduct involves multiple business entities owned by the partners, is nonetheless internal to a single market participant). "As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act." *Id.* at 53, 691 S.E.2d at 680; *see also Weaver Inv. Co. v. Pressly Dev. Assoc.*, 234 N.C. App. 645, 654, 760 S.E.2d 755, 761 (2014) (dismissing plaintiff's UDTPA claim because "defendants' misconduct within the confines of the partnership was not 'in or affecting commerce . . . .'").

57. Plaintiffs' claim for unfair or deceptive trade practices must fail to the extent it is based upon actions internal to the Franchise Company prior to the effective date of the Restructure Agreement Documents because such actions were not in or affecting commerce.

58. Similarly, Plaintiffs' claims relating to Harriet's internal mismanagement of the Franchise Company after the effective date of the Restructure Agreement Documents, including Plaintiffs' claims regarding Harriet's improper distribution of funds within the Franchise Company, are not in or affecting commerce and should be dismissed.

59. The Mills Motion to Dismiss Plaintiffs' third cause of action for unfair and deceptive trade practices, to the extent it is based on actions internal to the Franchise Company both prior to and after the effective date of the Restructure Agreement Documents, should be GRANTED.

60. After the effective date of the Restructure Agreement Documents, the Raleigh Studio and the Franchise Company were two separate businesses. Dealings between the two businesses were, arguably, in or affecting commerce. The allegations relating to dealings between the Franchise Company and the Raleigh Studio are thin, and are based entirely on the Franchise Company's control over the company website and enforcement of the TLA. Despite the thin allegations, the Court deems Plaintiffs' UDTPA claim based on allegations relating to relations between the Franchise Company and the Raleigh Studio sufficient to survive a Rule 12(b)(6) motion.

61.     The Mills Motion to Dismiss Plaintiffs' third cause of action for unfair and deceptive trade practices, to the extent it is based on alleged dealings between the Raleigh Studio and the Franchise Company after the effective date of the Restructure Agreement Documents, should be DENIED.

## F.     Civil Conspiracy

62.     Plaintiffs allege that Harriet, Patrick, and CSS "entered into an agreement to unlawfully and wrongfully cause devaluation of the Raleigh Studio to eliminate it as competition of the franchisees of the Franchise Company." (ECF No. 3, at ¶ 78.)  The Mills Defendants argue that Plaintiffs have not adequately alleged an agreement.  (ECF No. 13, at p. 20.)  Plaintiffs did not make any argument in support of the civil conspiracy claim in their responsive brief.

63.     "It is well established that 'there is not a separate civil action for civil conspiracy in North  Carolina'" and "the  conspiracy  charge  is  simply  a mechanism for associating the defendants and broadening the admissible evidence." *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *33 (N.C. Super. Ct. Oct. 21, 2016) (citations and quotations omitted).  In order to properly plead civil conspiracy, a complaint must allege "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted *by one or more* of the conspirators; and (4) pursuant to a common scheme." *Elliott v. Elliott*, 200 N.C. App. 259, 264, 683 S.E.2d 405, 409 (2009) (emphasis added).

> In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts. The charge

of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all.

*Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 773–74 (1966); *see also, GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *20 (N.C. Super. Ct. Sept. 9, 2011) ("Having joined the conspiracy, [two individual defendants] became exposed to liability with [co-defendant] and any other co-conspirators for damages caused by any act in furtherance of the common scheme.").

64. A claim for civil conspiracy cannot survive when it relies upon mere "suspicion or conjecture," *see S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609, 659 S.E.2d 442, 449 (2008), and should be dismissed when it "fails to allege how th[e] conspiracy came to be, or when, or where, or why" and "[t]he complaint asserts mere conclusions concerning the elements of civil conspiracy, without offering a scintilla of factual allegation in support of the claim." *Bottom v. Bailey*, 238 N.C. App. 202, 213, 767 S.E.2d 883, 890 (2014); *see also Worley v. Moore*, 2017 NCBC LEXIS 15, at *77 (N.C. Super. Ct. Feb. 28, 2017) (quoting *Thomas & Howard Co. v. Am. Mut. Liab. Ins. Co.*, 241 N.C. 109, 115, 84 S.E.2d 337, 341 (1954) and *Kirby v. Reynolds*, 212 N.C. 271, 284, 193 S.E. 412, 420 (1937)).

65. Plaintiffs do not allege facts that support the allegation that CSS participated in a civil conspiracy. To the extent the Mills Motion to Dismiss seeks dismissal of the fifth cause of action as against CSS, the motion should be GRANTED.

66. With regard to the alleged conspiracy between Harriet and Patrick, Plaintiffs allege that Harriet and Patrick "entered into an agreement to devalue the

Raleigh Studio and eliminate it as competition." (ECF No. 3, at ¶ 78.) Plaintiffs also allege that Harriet and Patrick spread false rumors about Emily, "disseminat[ed] false and misleading advertising about" Emily's involvement in the history of the Franchise Company, and wrongfully interfered with and terminated Emily's right to use the "Wine and Design" name and website. (ECF No. 3, at ¶¶ 21 and 59(E–G).) Plaintiffs further allege that Harriet and Patrick's actions interfered with Emily's ability to operate the Raleigh Studio and impaired its goodwill and reputation. (*Id*. at 60.)

67. The Court concludes that these allegations are minimally sufficient to support Plaintiffs' claim of a conspiracy between Harriet and Patrick. Accordingly, the Motions to Dismiss Plaintiffs' fifth cause of action against Harriet and Patrick should be DENIED.

**G. Derivative Claims**

68. Plaintiffs' sixth cause of action is labeled "Derivative Claims" and alleges "[i]n the alternative to the individual causes of action . . . [Emily] is entitled to bring these claims derivatively on behalf of Franchise Company." (ECF No. 3, at ¶ 84.) The Franchise Company moves to dismiss Emily's derivative claims with regard to the first, third, and fifth causes of action on the grounds that those causes of action allege only individual claims belonging to Emily, and not claims for injuries to the Franchise Company. (ECF No. 15, at pp. 6–13.) The Mills Defendants argue[1]

---

[1] In their brief in support, the Mills Defendants argued that Emily lacked standing to pursue the derivative claims because she had not made a proper demand on the Franchise Company pursuant to G.S. § 57D-8-01. (ECF No. 13, at pp. 21–22.) However, at the hearing on the

that all of Plaintiffs' claims, except for the claims based on Harriet's misappropriation of corporate funds, allege injuries only to Plaintiffs, and not the Franchise Company and are individual claims. (ECF No. 13, at p. 22.)

69. Generally, LLC members do not have standing to pursue individual causes of action for wrongs or injuries to the LLC. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997); *Corwin v. British Am. Tobacco PLC*, 796 S.E.2d 324, 338, 2016 N.C. App. LEXIS 1320, at \*37–39 (2016), *cert. granted*, 369 N.C. 751 (June 8, 2017) (No. 56PA17). A member may be permitted to bring derivatively claims belonging to the LLC if the member meets certain statutory requirements. G.S. § 57D-8-01. "A derivative proceeding is a civil action brought . . . in the right of' a corporation . . . while an individual action . . . [brought] to enforce a right which belongs to [plaintiff] personally." *Morris v. Thomas*, 161 N.C. App. 680, 684, 589 S.E.2d 419, 422 (2003) (internal quotation marks omitted) (quoting *Norman*, 140 N.C. App. at 395, 537 S.E.2d at 253). The purpose of derivative claims is to allow LLC members to assert the rights of the harmed LLC, and recovery in such actions flows to the LLC, not to the individual member. *Green*, 367 N.C. at 141–42, 749 S.E.2d at 268.

70. Accordingly, the Court must determine whether Emily's[2] claims truly belong to the corporation or whether Emily's claims are truly individual claims. *Norman*, 140 N.C. App. at 395, 537 S.E.2d at 253. The Court notes that the law

Motions to Dismiss, all Defendants conceded Emily had satisfied the demand requirements and that the Court has subject matter jurisdiction over Emily's derivative claims.

[2] Emily is alleged to be a member of the Franchise Company, but the Raleigh Studio is not alleged to be a member. Any derivative claims, therefore, would be brought by Emily.

restricts the types of derivative claims because of "concerns that derivative actions will be misused by self-selected advocates pursuing individual gain rather than the interests of the corporation or the shareholders as a group, bringing costly and potentially meritless strike suits." *Id.* (citations and quotations omitted).

71. Emily's third cause of action for unfair or deceptive trade practices and fifth cause of action for civil conspiracy are alleged as individual claims for injuries to Emily and the Raleigh Studio, and do not state claims belonging to the Franchise Company. (ECF No. 3, at ¶¶ 78, 81.) Plaintiffs do not allege that the Franchise Company was injured by these acts.

72. Therefore, the Franchise Company Motion to Dismiss Emily's derivative claims based on the third and fifth causes of action should be GRANTED.

73. Plaintiffs' first cause of action alleging breaches of fiduciary duty prior to and surrounding the execution of the Restructure Agreement Documents does not allege any injury to the Franchise Company. (ECF No. 3, at ¶¶ 56–58.) The Franchise Company Motion to Dismiss Emily's derivative claims based on alleged conduct prior to execution of the Restructure Agreement Documents should be GRANTED.

74. Plaintiffs' allegations regarding Harriet's breaches of fiduciary duty following the execution of the Restructure Agreement Documents include some conduct that could form the basis of a derivative claim. Plaintiffs allege that Harriet misappropriated the Franchise Company's funds and diverted them to herself, Patrick, and CSS. (*Id.* at ¶ 59(C).) Following execution of the Restructure Agreement

Documents, Harriet was the manager of the Franchise Company, and she owed fiduciary duties to the Franchise Company. The alleged misappropriation and diversion of funds would have caused injury to the Franchise Company, and could be the basis for a derivative claim.

75. In addition, Emily may have standing to bring direct claims against Harriet based on the special duty exception from *Barger*. Harriet undertook obligations to Emily pursuant to the Restructure Agreement Documents that were separate from, and in addition to, Harriet's duties arising out of her status as majority member in the Franchise Company. *See Barger*, 346 N.C. at 658, 488 S.E.2d at 219 (stating that one exception to the general rule that a shareholder cannot pursue derivative actions is "where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder"). If Harriet owed Emily a special duty following execution of the Restructure Agreement Documents, that would provide grounds for Emily to pursue direct claims for breach of fiduciary duty against Harriet separate from her individual claim for breach of fiduciary duty. *See Zoutewelle v. Mathis*, 2018 NCBC LEXIS 95, at *26–27 (N.C. Super. Ct. Sept. 13, 2018) (holding that a marital settlement agreement containing obligations in addition to and outside of LLC operating agreements created special duties on former husband towards ex-wife as member of jointly owned LLCs).

76. Accordingly, the Franchise Company Motion to Dismiss, to the extent it seeks dismissal of Emily's derivative or direct claims based on Harriet's conduct as

manager of the Franchise Company after the execution of the Restructure Agreement Documents, should be DENIED.[3]

### III. CONCLUSION

In conclusion, the Court FINDS, CONCLUDES, and ORDERS as follows:

1. To the extent Plaintiffs seek an order declaring the Restructure Agreement Documents void or voidable, as alleged in paragraph 58 of the FAC, the Motions to Dismiss are GRANTED, and that claim and those allegations are DISMISSED, WITHOUT PREJUDICE.

2. The Mills Motion to Dismiss Plaintiffs' first cause of action against Patrick and CSS is GRANTED, and the claim is DISMISSED.

3. The Mills Motion to Dismiss the first cause of action to the extent the claim is based on acts occurring prior to the execution of the Restructure Agreement Documents is GRANTED, and the claim is DISMISSED.

4. The Mills Motion to Dismiss the first cause of action to the extent the claim is based on acts occurring after the execution of the Restructure Agreement Documents is DENIED.

5. To the extent Plaintiffs attempt to state claims for coercion, duress, and undue influence, those claims are DISMISSED, WITHOUT PREJUDICE.

6. The Mills Motion to Dismiss Plaintiffs' second cause of action against Patrick and CSS is GRANTED, and those claims are DISMISSED.

---

[3] To the extent Mills Defendants seek dismissal of Emily's direct and derivative claims under the second cause of action for conversion and misappropriation of Franchise Company funds, the Mills' Motion should be DENIED.

7. The Mills Motion to Dismiss Plaintiffs' second cause of action for conversion and misappropriation of corporate funds is DENIED.

8. The Mills Motion to Dismiss Plaintiffs' second cause of action for waste of corporate assets is GRANTED, and the claim is DISMISSED.

9. The Mills Motion to Dismiss Plaintiffs' third cause of action for conspiracy in restraint of trade is GRANTED, and the claim is DISMISSED.

10. The Mills Motion to Dismiss Plaintiffs' third cause of action for unfair and deceptive trade practices, to the extent it is based on actions internal to the Franchise Company both prior to and after the effective date of the Restructure Agreement Documents, is GRANTED, and the claims are DISMISSED.

11. The Mills Motion to Dismiss Plaintiffs' third cause of action for unfair and deceptive trade practices, to the extent it is based on alleged dealings between the Raleigh Studio and the Franchise Company after the effective date of the Restructure Agreement Documents, is DENIED.

12. The Mills Motion to Dismiss Plaintiffs' fifth cause of action for civil conspiracy against CSS is GRANTED, and the claim is DISMISSED.

13. The Mills Motion to Dismiss Plaintiffs' fifth cause of action for civil conspiracy against Harriet and Patrick is DENIED.

14. The Franchise Company Motion to Dismiss Emily's derivative claims based on the third and fifth causes of action is GRANTED, and such claims are DISMISSED.

15. The Franchise Company Motion to Dismiss Emily's derivative claim based on the first cause of action relating to actions taken prior to the execution of the Restructure Agreement Documents is GRANTED, and such claims are DISMISSED.

16. The Franchise Company Motion to Dismiss Emily's derivative or direct claims based on the first cause of action relating to Harriet's conduct as manager of the Franchise Company after the execution of the Restructure Agreement Documents is DENIED.

17. To the extent the Mills Defendants seek Dismissal of Emily's direct and derivative claims under the second cause of action, the motion is DENIED.

18. Except as expressly stated herein, Defendants' Motions to Dismiss Plaintiffs' claims are DENIED.

SO ORDERED, this the 24th day of September, 2018.


  /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases